(No. 6420.   November 15, 1938.)

M. A. KELLEY and V. A. KELLEY, Copartners Doing Business Under the Firm Name and Style of KELLEY MOTOR COMPANY, Appellants, v. JOHN A. BAISCH, Jr., Respondent.

[87 Pac. (2d) 465.]

Chapman & Chapman, for Appellants.

Frank L. Stephan and J. H. Blandford, for Respondent.

MORGAN, J.—Prior to May 6, 1929, appellants owned and operated a garage in the village of Hazelton, whereat they conducted the business of selling gasoline and other petroleum products. On that date they and their wives, as parties of the first part, entered into a contract with respondent and his wife, as parties of the second part, wherein it was agreed that first parties should (and thereafter they did) convey to second parties certain lots in the village of Hazelton, and that second parties should (and thereafter they did) erect on a portion of said lots a gasoline service station. The parties of the second part, in the first paragraph of said contract, leased to the parties of the first part the portion of the lots on which the service station was erected, and other real estate adjacent thereto, belonging to second parties, together with all buildings and improvements situated, or thereafter to be erected, on said property. It is stated in said fifth paragraph:

"The consideration as rental for the use and possession of the said property and buildings is hereby understood and agreed to be as follows: The first parties will and must purchase from the second parties the products (gasoline, oil, etc.) which he has the disposal of during the continuance of this agreement. In the event the second parties should handle some other brand of products than that now handled then the first parties shall make the exchange accordingly, . . . . "

The sixth paragraph is as follows:

"*Sixth*: That the second parties agree to give the first parties the same margin of profit that they receive between the wholesale and retail prices of products as is received by them at their own gas stations."

The seventh paragraph provides:

"*Seventh*: That the term of lease agreement under paragraph five (5) of this agreement shall continue and remain in effect as long as the first parties reside in Hazelton and continue in the gas and oil business at their garage and the service station specified herein."

This action grows out of disagreement between the parties as to the proper interpretation of the sixth paragraph of the contract.

Trial was commenced to a jury. After considerable evidence was introduced it was stipulated the jury be dismissed and the case be submitted, for decision, to the trial judge on the evidence taken and on a stipulation of facts entered into between the parties litigant.

The record shows that at the time the contract was entered into respondent and his wife owned several gasoline service stations, in addition to the one thereafter operated by appellants; that from May 6, 1929, to on or about May 15, 1930, respondent had a distributor's bulk plant agreement, for the territory in and about Twin Falls, including the service station at Hazelton in charge of appellants, with Southern Idaho Oil Company, pursuant to which he was paid a distributor's commission, on sales of petroleum sold for it by him; that on or about May 15, 1930, Shell Oil Company purchased Southern Idaho Oil Company and respondent entered into a selling agency contract with the former, effective on or about that date; that he continued to act as distributing agent for Shell Oil Company until February, 1933, when he entered the employ of Standard Oil Company of California to act as its distributing agent in the said territory, and continued in such employment with the last-named company during the remainder of the time involved in this litigation.

At the time of purchasing Southern Idaho Oil Company, Shell Oil Company entered into contracts with respondent

and his wife, entitled "Service Station Lease" whereby it purported to lease from them their service stations. What is referred to as "a representative copy" of the contract relating to a station known as "the Five Point Service Station" was introduced in evidence. We understand from the record the other contracts between Shell Oil Company and respondent and his wife, with respect to other stations, were of like import to the copy introduced. Paragraph 14 of said copy is as follows:

"14. RENTAL: The rental for the said premises shall be a sum equivalent to one cent (1¢) per gallon for each gallon of Shell gasoline sold on the above described premises. The lessee shall pay to the lessor on the first day of each and every month of said term, excepting the first month thereof, the rental accruing during the preceding month. However, it is understood and agreed by and between the lessor and lessee herein that the rental payable hereunder shall, at all times, be a sum not less than $75.00 per month."

There was offered in evidence, and erroneously rejected, a like contract, dated December 20, 1930, denominated "Service Station Lease," between respondent and his wife and Shell Oil Company, with respect to the service station leased by respondent and his wife to appellants, May 6, 1929. Paragraph 14 in the contract, last above mentioned, with the oil company is identical with that above quoted except that the minimum amount to be paid as rental is therein stated to be $35 per month instead of $75 per month.

During a portion of the time respondent has been engaged in handling the products of Standard Oil Company of California, there existed between him and that company contracts purporting to be leases to it of certain gasoline service stations belonging to him, including the one leased by respondent and his wife to appellants. In these purported leases, it is provided:

"The Lessee agrees to use the property herein leased for the sale of gasoline and other motor fuels and to diligently promote such sale, and the Lessee agrees to pay to the Lessor on the 15th day of each and every month, as rental, a sum equivalent to one cent (1¢) a gallon for each gallon of gasoline delivered by Lessee on said premises during the

preceding calendar month, but not less than $—— monthly during the term of this lease. Lessee shall have the right to apply any or all of such rental at any time to the payment of any indebtedness due or to become due from Lessor to Lessee. Such application when made shall be deemed to be payment of such rental.''

Respondent's agency for Standard Oil Company of California, and commissions to be paid to him by it for services as such, were provided for in a contract between them dated December 29, 1932.

The use of contracts, designated ''leases,'' between respondent and the oil companies, including the one relating to the service station leased to and operated by appellants, apparently was a subterfuge, probably intended to cover up the true nature of the transaction whereby said companies were obligated to pay, and did pay, to respondent one cent per gallon of gasoline sold to appellants and others who operated stations leased from him. Respondent could not, at any time covered by said purported leases, have leased the service station in question to anyone, because he had, theretofore, leased it to appellants by a contract the terms of which were and are entirely inconsistent with the use or occupancy of the leased premises by anyone other than themselves, and the term of their tenancy had not expired. For that or some other reason, which does not appear in the record, the ''lease'' idea apparently was abandoned by Standard Oil Company of California for, under date August 15, 1933, it wrote to respondent as follows:

'' . . . . Please refer to our agreement with you dated December 29, 1932, covering the sale of our petroleum products from our plant at Twin Falls, Idaho:

''In addition to the commissions provided in said agreement, we agree to pay you, effective from and after June 5, 1933, and until further notice, the sum of one cent for each gallon of our gasoline delivered by you to the following service stations: . . . . ''

Then follows the names of ten service stations, owned by respondent, including that of the one leased to appellants. A like letter was written by said company, dated September 15, 1933, in which the sum to be paid was fixed at one-half

cent per gallon, and another such letter was written, dated October 6, 1934, wherein the sum to be paid was fixed at one cent per gallon, but only six service stations were named in the last-mentioned letter, including that leased to appellants.

It appears to be well understood among those engaged in the business that the term "margin of profit" on gasoline, when applied to a retail dealer, means the difference between the price he is required to pay and the price at which he may sell. It further appears that appellants have received and retained the difference between what they paid for gasoline and what they sold it for, with the exception of a sum of money collected from them by respondent, for the recovery of which judgment was awarded in their favor. With respect to this item it was stated, in the stipulation submitting the case to the trial judge for decision:

"That during the period from June 2, 1934, to April 11, 1935, the defendant wrongfully collected from plaintiffs 1 cent per gallon on all gasoline delivered by defendant to plaintiffs during said period, and that the plaintiffs during said period in fact made a margin of profit of 3 cents and 2 cents per gallon, respectively, on second and third grades of gasoline between said dates, and that the plaintiffs during said period are entitled to recover from the defendant at least 1 cent per gallon for all gasoline delivered to them by the defendant at their service station at Hazelton."

The record shows that, at the time the contract here under consideration was entered into, the prices at which operators of service stations should purchase and resell gasoline were fixed by the oil companies, and that it was customary to allow the operator, if he was owner of the station, an additional margin of profit because of his ownership of it. In case the owner was not the operator of the station and had a contract that a certain sum per gallon of gasoline sold thereat should be paid to him, the oil company would deduct it from the margin of profit the operator would have received had the station been his property, and pay it to the owner.

It is not contended by appellants that respondent is required by the contract to pay them any part of the commissions received by him from the oil companies, earned in

acting as their distributing agent. Respondent does not contend appellants are required to pay him any rental for the use and occupancy of the service station, other than the consideration stated in the contract, to wit: To purchase from him the products he has the disposal of, which they have done. The question to be decided is as to whether moneys paid, per gallon, to respondent by the oil companies, because of a gasoline sold to appellants and his other tenants, were "margin of profit" received by him, within the meaning of the sixth paragraph of the contract sued on in this action.

In that paragraph it is agreed that respondent and his wife will give to appellants "the same margin of profit that they receive between the wholesale and retail prices of products as is received by them at their own gas stations." Respondent contends that provision should be construed to mean they will give appellants the same margin of profit between the wholesale and retail prices of products as is received by *their other tenants at their other gas stations.* The contract does not so provide.

█ Appellant, V. A. Kelley, testified he had a conversation with respondent, at the distributing plant in Twin Falls, with respect to appellants' margin of profit, at which were also present the father of the witness and a man named Nelson; that during the conversation respondent said, "I am getting one cent a gallon rental and always have been from the Shell Oil Company." . . . . and that he said, "I will give you this one cent." The witness further testified that after the conversation, and until June 7th, appellants received one cent per gallon more profit than they had immediately prior to the conversation. That testimony is undisputed. In construing an indefinite or ambiguous contract, the interpretation placed on it by the parties thereto is to be considered by the court and should be given great weight in ascertaining their understanding of its terms. (12 Am. Jur. 787, Contracts, sec. 249.)

We are unable to reach the conclusion that the margin of profit, mentioned in the sixth paragraph of the contract, is the difference between the wholesale price, which service station tenant operators paid to the oil companies, and the

retail price which they were permitted to collect from their customers. The language employed clearly indicates something other than that was intended.

The sixth paragraph does not relate to profit made by respondent's tenants. It refers to profit made by him. That profit was paid to him by the oil companies, sometimes under the name of rentals, because of his ownership of service stations whereat their products were sold. No doubt their object was to secure and retain an outlet for their goods and, with that end in view, they desired to encourage respondent to procure his tenants to deal with them. We hold that the margin of profit which respondent, in the sixth paragraph of the contract, agreed to give to appellants, includes the sums of money paid to him, per gallon, because of gasoline sold to them by the oil companies and that they are entitled to a judgment against him therefor.

The record shows the number of gallons of gasoline sold to appellants by the oil companies and the amount of money paid, per gallon, to respondent because of such sales to them, and the amount per gallon paid to him, by said companies, by reason of sales of gasoline made to the tenants of his other stations during the same time. The case is remanded to the trial judge with direction to compute the amount due from respondent to appellants, according to the views herein expressed, and to enter judgment against him in their favor therefor, together with interest thereon as provided by law. Costs are awarded to appellants.

Holden, C. J., and Givens, J., concur.

Ailshie and Budge, JJ., dissent.